1

2

3

4

5

6

7

8                         UNITED STATES DISTRICT COURT

9                         EASTERN DISTRICT OF CALIFORNIA

10

11    KOLLEEN MCNAMEE,                           No.  2:12-cv-03101-MCE-AC

12                    Plaintiff,

13         v.                                     **MEMORANDUM AND ORDER**

14    THE ROMAN CATHOLIC DIOCESE
      OF SACRAMENTO, ST. FRANCIS
15    HIGH SCHOOL, MARION BISHOP,
      PATRICK O'NEILL, ANN MARIE
16    FAIRES, DOES 1 through 20,
      inclusive,
17
                      Defendants.
18

19

20         Through the present employment discrimination lawsuit, Plaintiff Kolleen

21    McNamee ("Plaintiff") seeks to recover damages from Defendants Roman Catholic

22    Diocese of Sacramento ("Diocese"), St. Francis High School ("St. Francis"), Marion

23    Bishop ("Bishop"), Patrick O'Neill ("O'Neill"), and Ann Marie Faires ("Faires") (collectively

24    "Defendants").  ECF No. 24.  In her First Amended Complaint ("FAC"), Plaintiff asserts

25    two claims against Defendants Diocese and St. Francis alone: (1) Title VII retaliation;

26    and (2) gender discrimination.  Plaintiff asserts an additional claim for defamation against

27    all Defendants.  Presently before the Court are Defendants' motions for summary

28    judgment pursuant to Federal Rule of Civil Procedure 56, or in the alternative, for partial

                                              1

1   summary judgment.  ECF Nos. 40-41.  For the following reasons, both motions are

2   DENIED.[1]

3

4                                   **BACKGROUND**

5

6          Plaintiff worked as athletic director of St. Francis from 2001 until her employment

7   was terminated on August 3, 2012.  Pl.'s Resp. to Def. Diocese's Statement of

8   Undisputed Facts ("SUF"), ECF No. 55-1, at ¶ 1, 38.  St. Francis is an all-girls Catholic

9   high school that, at all times relevant to this action, was owned and operated by the

10  Diocese.  SUF ¶ 2.  In 2004, Plaintiff was part of a panel that hired Vic Pitton ("Pitton") as

11  head coach of the St. Francis varsity basketball team.  Id. at ¶¶ 7, 8.  Pitton had

12  previously been terminated by a prior St. Francis principal for alleged unsportsmanlike

13  conduct.  Id. at ¶ 89.  Plaintiff supervised Pitton as part of her role as athletic director.  Id.

14  at ¶ 7.  This action arises from Plaintiff's claims she was retaliated and discriminated

15  against in connection with her subsequent attempts to discipline and terminate Pitton

16  from his coaching position.  She further alleges that her colleagues made defamatory

17  statements about her abilities as athletic director and her relationships with St. Francis

18  staff.

19         Starting in early 2009, Plaintiff noted deficiencies in Pitton's performance and

20  determined that he should be terminated.  SUF ¶ 10.  Plaintiff wrote a memorandum

21  detailing her concerns about Pitton and expressing her belief that he should not return

22  as a basketball coach.  Id. at ¶ 11.  She sent the memorandum to her supervisors at the

23  time, Principal Andrea Agos ("Agos") and Assistant Principal Trisha Uhrhammer

24  ("Uhrhammer").  Id. at ¶ 11.  Plaintiff alleges that Agos and Uhrhammer agreed with her

25  proposed course of action.  Id. at ¶ 10.  According to Plaintiff, Agos tried to convince

26  Pitton to resign, but when he would not, Agos, Uhrhammer, and Plaintiff decided

27  _____

28         [1] Because oral argument would not be of material assistance, the Court ordered this matter
    submitted on the briefing. E.D. Cal. Local Rule 230(g).
           [2] In the SUF, Defendants allege, and Plaintiff does not dispute, that Plaintiff was presented with

                                            2

together to put him on probation.  Id. at ¶ 12.  Defendants, on the other hand, allege that Plaintiff acted alone in taking steps to put Pitton on probation.  Id. at ¶ 13.  Regardless, according to Defendants, administrators monitored Pitton at every basketball game during the 2009-2010 season, and, at the end of the season, Pitton received passing marks on his evaluation from all of the administrators, including Plaintiff's assistant athletic director.  Id. at ¶¶ 15, 16.

Then, on September 17, 2010, Plaintiff submitted a complaint to her then supervisors, President Bishop, Principal O'Neill, and Assistant Principal Faires (who had succeeded Uhrhammer), alleging that she had been subjected to workplace bullying, defamation, and a hostile work environment, and that she was not receiving "sufficient support" from her supervisors in addressing and/or correcting this alleged behavior.  SUF ¶ 20; McNamee Sept. 17, 2010 Letter, Ex. 20, ECF No. 51, at 35-41.  Specifically, Plaintiff states that she had experienced insubordination and harassment from Pitton and other male basketball coaching staff.  ECF No. 51 at 38.  Plaintiff goes on to allege that Pitton's "actions, reactions and course of conduct show a pattern of behavior over a number of years that have created a hostile work environment for her" and that she failed to receive support from St. Francis administration.  Id.

In the meantime, Pitton continued as head coach, and at the end of the 2010-2011 season, Plaintiff claims she continued to find deficiencies with his conduct and job performance.  At O'Neill's request, Plaintiff prepared a document specifically identifying how Plaintiff believed Pitton had failed to comply with the "Victory with Honor" code of St. Francis.  SUF ¶¶ 23-24.  From Plaintiff's account, the administrators indicated to her that they agreed with her assessment of Pitton's performance and that he would not be rehired for the following season.  Diocese Defs.' Resp. to Pl.'s Disputed Facts ("DF Diocese"), ECF No. 55-1, at ¶ 100.  However, on May 26, 2011,[2] while Plaintiff was

---

[2] In the SUF, Defendants allege, and Plaintiff does not dispute, that Plaintiff was presented with the restructure plan on March 26, 2011.  SUF ¶ 25.  However, the Court recognizes that this is an inadvertent mistake by both parties, since multiple documents refer to "May" 26, 2011, as the date Plaintiff was notified of the restructure plan.  ECF No. 51, Exs. 30, 31, at 45, 48-49.

1    on maternity leave, the administration announced that Pitton would continue in his

2    position as coach, and that he and the basketball program would now report to Assistant

3    Principal Ivan Hrga, who had no experience in athletics, instead of to Plaintiff or to

4    Plaintiff's direct supervisor (who was also female).  Id. at ¶ 25; Individual Defs.' Resp. to

5    Pl.'s Disputed Facts ("DF Individuals"), ECF No. 54-1, at ¶ 75.

6         On June 9, 2011, Plaintiff sent a letter to the superintendent of Catholic Schools

7    and the chancellor for the Diocese expressing her concerns with the restructuring plan

8    and with Pitton.  SUF at ¶ 26.  She indicated that she was concerned that Pitton had

9    been retained at St. Francis despite a prior decision not to rehire him, and that she had

10   not been provided with an explanation of why they decided to retain him.  McNamee

11   June 9, 2011 Letter, Ex. 31, ECF No. 51, at 48-49.  Plaintiff also stated that Pitton had

12   bullied her and referenced the formal complaint letter she sent Bishop, O'Neill, and

13   Faires on September 17, 2010, detailing this alleged mistreatment.  Id. at 50.  Based on

14   the record before the Court, these upper level St. Francis administrators never met with

15   Plaintiff to discuss her concerns with the alleged harassment, the restructuring plan, or

16   her supervisors' failure to correct Pitton's behavior.

17        Plaintiff contends that her concerns about retaliation grew in the spring of 2012,

18   when she received a written warning from Faires regarding two incidents: (1) her failure

19   to let a parent into the male coaches' room to obtain water and Gatorade; and (2) her

20   failure to have an injured basketball player's hand taped.  McNamee Decl., Ex. K, ECF

21   No. 49, at ¶ 43.  After receiving this warning, Plaintiff avers that she complained of

22   retaliatory and discriminatory treatment to O'Neill, but she received no response.

23   DF Diocese ¶ 112.

24        On July 1, 2012, Brown succeeded Bishop as the President of St. Francis.  Over

25   the month of July, Brown met several times with Plaintiff to discuss her workplace

26   complaints.  SUF ¶ 32.  Plaintiff alleges that at a meeting on July 3, 2012, she expressed

27   concern to Brown with the discrimination and retaliation at St. Francis in hopes that

28   corrective action would be taken.  Id.  Additionally, at these meetings, Defendants allege

1    that Plaintiff and Brown discussed Plaintiff's voluntary resignation.  Plaintiff, on the other

2    hand, claims only that Brown suggested she leave St. Francis for a short period of time.

3    Id. at ¶ 34.  It is undisputed that on August 3, 2012, Brown terminated Plaintiff's

4    employment.  Id. at ¶ 38.

5          After a national search to fill the athletic director position, a pool of 18 applicants

6    was selected and interviewed by a search committee that had been created and

7    appointed by O'Neill.  SUF at ¶ 41.  From the 18 applicants, the field of candidates was

8    narrowed to two potential candidates: one male and one female.  Id. at ¶ 42.  The

9    position was ultimately offered to the male candidate, Mark McGreevy.  Id. at ¶ 44.

10          Unbeknownst to Plaintiff, during this time, her colleagues Bishop, O'Neill and

11   Faires purportedly made several defamatory statements about her performance as

12   athletic director as well.[3]  First, on June 16, 2011, Bishop and O'Neill sent a letter to the

13   superintendent of Catholic Schools and the chancellor for the Diocese containing the

14   following statements about Plaintiff: "McNamee's letter[4] contains many inaccuracies";

15   she "continues to be difficult to manage"; she is "divisive"; she "does not follow through";

16   she has "difficult relationships with parents"; and "voices a lack of support for her

17   immediate supervisor and administration in general."  Pl.'s Reply to Individual Defs.'

18   Statement of Undisputed Facts ("SUF Individuals"), ECF No. 54-1, at ¶ 16.  Second, on

19   September 20, 2011, Faires wrote an "Incident Report" with the following comments

20   about Plaintiff: her "behavior was unprecedented and extremely unprofessional"; she "is

21

22          [3] To the extent Plaintiff alleges new defamatory statements in her Opposition that are not included
     in her FAC, those claims are disregarded because they are not properly before the Court.  See Gilbert v.
23   Sykes, 147 Cal. App. 4th 13, 31 (2007) ("The general rule is that the words constituting an alleged libel
     must be specifically identified, if not pleaded verbatim, in the complaint."); see also Qualls v. Regents of
24   the Univ. of Cal., No. 1:13-cv-00649, 2013 WL 4822587, at *8 (E.D. Cal. 2013) (dismissing plaintiff's
     defamation claim because, among other things, he failed to identify the allegedly defamatory statements
25   with sufficient detail).  Specifically, Plaintiff failed to identify the following communications in her FAC: the
     new verbal statements from Faires; and the statements from the June 8, 2012 memorandum and the
26   July 30, 2012 memorandum.  ECF No. 44 at 16-17.

27          [4] Plaintiff contends, and Defendants do not dispute, that the referenced "letter" refers to
     McNamee's June 9, 2011, complaint letter to the superintendent of Catholic Schools and the chancellor of
28   the Diocese.  ECF No. 44 at 3.

1  notorious for manipulating a situation until she gets what she wants despite who she

2  harasses along the way"; and the incident proved her "inability to be a team player, to

3  work collaborative, [sic] and to be professional." Id. at ¶ 22.  Finally, on June 13, 2012,

4  Faires wrote the following notes about what she claimed Plaintiff's actions demonstrated:

5  "a lack of responsiveness to direction"; "unwillingness to take direction"; "a pattern of

6  unresponsiveness"; "an inability to separate personal feelings from business decisions";

7  "an unwillingness to be held accountable"; "a lack of collegiality"; "insubordination"; and

8  "lack of director level work ethics." Id. at ¶ 28.

9        Eventually, in October 2012, Plaintiff filed an administrative complaint with the

10  Employment Equal Employment Opportunity Council ("EEOC"). SUF ¶ 50. She filed the

11  present action after receiving a right-to-sue notice.  Id. at ¶ 51.  In November 2013, she

12  filed her operative First Amended Complaint ("FAC").[5] ECF No. 24.

13

14                              **STANDARD**

15

16        The Federal Rules of Civil Procedure provide for summary judgment when "the

17  pleadings, depositions, answers to interrogatories, and admissions on file, together with

18  affidavits, if any, show that there is no genuine issue as to any material fact and that the

19  moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex

20  Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is

21  to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

22        Rule 56 also allows a court to grant summary judgment on part of a claim or

23  defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may

24  move for summary judgment, identifying each claim or defense—or the part of each

25  claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v.

26  Madan, 889 F. Supp. 374, 378–79 (C.D. Cal. 1995).  The standard that applies to a

27  _____

28        [5] Defendants make numerous objections to Plaintiff's evidence.  ECF Nos. 54-3, 55-4.  Because
the Court does not rely upon any of the objected evidence in this order, those objections are moot.

6

1   motion for partial summary judgment is the same as that which applies to a motion for

2   summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic

3   Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir.1998) (applying summary

4   judgment standard to motion for summary adjudication).

5        In a summary judgment motion, the moving party always bears the initial

6   responsibility of informing the court of the basis for the motion and identifying the

7   portions in the record "which it believes demonstrate the absence of a genuine issue of

8   material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

9   responsibility, the burden then shifts to the opposing party to establish that a genuine

10   issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith

11   Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.

12   253, 288–89 (1968).

13        In attempting to establish the existence or non-existence of a genuine factual

14   dispute, the party must support its assertion by "citing to particular parts of materials in

15   the record, including depositions, documents, electronically stored information,

16   affidavits[,] or declarations ... or other materials; or showing that the materials cited do

17   not establish the absence or presence of a genuine dispute, or that an adverse party

18   cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

19   opposing party must demonstrate that the fact in contention is material, i.e., a fact that

20   might affect the outcome of the suit under the governing law.   Anderson v. Liberty

21   Lobby, Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of

22   W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  The opposing party

23   must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the

24   evidence is such that a reasonable jury could return a verdict for the nonmoving party."

25   Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary

26   question before the evidence is left to the jury of "not whether there is literally no

27   evidence, but whether there is any upon which a jury could properly proceed to find a

28   verdict for the party producing it, upon whom the onus of proof is imposed."  Id. at 251

1   (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)).  As the Supreme Court

2   explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its

3   opponent must do more than simply show that there is some metaphysical doubt as to

4   the material facts."  Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as

5   a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6   'genuine issue for trial.'"  Id.

7        In resolving a summary judgment motion, the evidence of the opposing party is to

8   be believed, and all reasonable inferences that may be drawn from the facts placed

9   before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

10  255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

11  obligation to produce a factual predicate from which the inference may be drawn.

12  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd,

13  810 F.2d 898 (9th Cir. 1987).

14

15                              **ANALYSIS**

16

17       **A.    First Claim for Relief: Title VII - Retaliation**

18        Plaintiff asserts a retaliation claim against Defendants St. Francis and Diocese

19  under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  FAC ¶ 22-30.

20  To make out a prima facie case of retaliation, Plaintiff must show that: (1) she engaged

21  in a protected activity; (2) her employer subjected her to an adverse employment action;

22  and (3) a causal link exists between the protected activity and the adverse action.  See

23  Steiner v. Showboat Operating Co., 25 F.3d 1459, 1464 (9th Cir. 1994).  In the

24  termination context, the employee must show "by a preponderance of the evidence that

25  engaging in the protected activity was one of the reasons for the firing and that but for

26  such activity the plaintiff would not have been fired."  Ruggles v. Cal. Polytechnic State

27  Univ., 797 F.2d 782, 785 n.4 (9th Cir. 1986) (quoting Kauffman v. Sidereal Corp., 695

28  F.2d 343, 345 (9th Cir. 1982)).  Once a prima facie retaliation claim is established, the

1  burden shifts to Defendants to articulate a legitimate nondiscriminatory reason for the

2  decision.  Steiner, 25 F.3d at 1464-65.  If the Defendants articulate such a reason,

3  Plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext

4  for a discriminatory motive.  Id. at 1465.

5      Defendants do not dispute that Plaintiff's discharge would qualify as an adverse

6  employment action.  Rather, they contend that she cannot show that she engaged in a

7  protected activity or that there is a causal link between the alleged protected activity and

8  her discharge.  ECF No. 41-1 at 8-11.  At this stage, the Court disagrees.

9      First, Plaintiff need only show that she engaged in some form of protected activity.

10  Protected activity is defined by statute as "oppos[ing] any practice made an unlawful

11  employment practice" under Title VII.  42 U.S.C. § 2000e-3(a).  However, the opposed

12  employment practice need not itself be unlawful, as long as the employee had a

13  reasonable belief that the practice violated Title VII.  Under Title VII, it is unlawful for an

14  employer to discriminate against any individual based on their gender.  Id. § 2000e–

15  2(a)(1).  "[A] complaint by an employee that a supervisor has violated Title VII may

16  constitute protected activity for which the employer cannot lawfully retaliate."  E.E.O.C. v.

17  Go Daddy Software, Inc., 581 F.3d 951, 963 (9th Cir. 2009) (citing Trent v. Valley Elec.

18  Ass'n, Inc., 41 F.3d 524, 526 (9th Cir. 1994).

19      Here, Plaintiff alleges that she complained about gender discrimination and

20  harassment on at least four separate occasions.  In September 2010, Plaintiff claims that

21  she complained to the Diocese about St. Francis administrators failing to take corrective

22  action against harassment from male basketball coaches against her and others.  Then,

23  in June 2011, Plaintiff claims that she complained to the superintendent and chancellor

24  about having the basketball program removed from her responsibilities, which she

25  perceived as gender discrimination.  In the spring of 2012, Plaintiff complained to

26  Principal O'Neill that her supervisor Faires was discriminating against her by

27  reprimanding her unjustly.  Finally, in July 2012, Plaintiff made the same complaints of

28  discriminatory treatment to Brown, the new St. Francis president.  These allegations are

1    enough to meet her burden in showing that she engaged in protected activity.

2            Defendants nonetheless argue that the primary focus of Plaintiff's complaints was

3    on Pitton, his staff, and parents of girls on the basketball team.  ECF No. 41-1 at 13.

4    Defendants contend that since none of these individuals had supervisory responsibility

5    over Plaintiff, they could not unlawfully discriminate against her under Title VII.  ECF

6    No. 41-1 at 14.  Defendants misinterpret Plaintiff's allegations.  Each of the four alleged

7    complaints pertained to discriminatory treatment Plaintiff believed she was receiving

8    from her supervisors, and she alleges that the complaints were made to staff that had

9    oversight of those supervisors.  Notwithstanding the fact that the underlying dispute

10   stemmed from Plaintiff's interactions with her subordinates (the male basketball

11   coaches), the ultimate complaints related to her supervisors' failure to prevent the

12   harassment, as well as their allegedly discriminatory response to Plaintiff's complaints.

13   They therefore fall under the protection of Title VII.

14           Moreover, Plaintiff presents sufficient evidence for a jury to determine that she

15   had a reasonable belief that her supervisors' conduct violated Title VII.  From Plaintiff's

16   account, she was subjected to discriminatory treatment at the hands of her supervisors

17   by way of their failure to take action against the harassment from the male basketball

18   coaches and by taking punitive measures against her for reporting that harassment.

19   Plaintiff then reported that discrimination to the supervisors in the chain of command at

20   St. Francis and specifically stated that she was subjected to discriminatory treatment by

21   her supervisors.  The undisputed fact that Plaintiff's supervisory duties over the

22   basketball program were taken away from her while she was on maternity leave only

23   bolsters the gender discrimination argument.  In contrast, Defendants assert that her

24   complaints were about administrative and personnel concerns, rather than gender

25   discrimination.  ECF 41-1 at 14.  However, viewed in the light most favorable to Plaintiff,

26   there is enough evidence here for a jury to conclude that Plaintiff was reporting gender

27   discrimination and therefore participated in a protected activity.

28           Plaintiff must still show a causal link between her protected activity and the

1    adverse employment action ultimately taken against her.  For purposes of a prima facie

2    case, in the absence of direct evidence, the causal link is frequently inferred from two

3    elements of circumstantial evidence: first, that the defendant knew of the plaintiff's

4    protected activity at the time the adverse action was taken, and second, that there was

5    closeness in time between the protected action and the allegedly retaliatory employment

6    decision.  Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (finding sufficient

7    proximity where the gap was less than three months); Miller v. Fairchild Indus., Inc., 797

8    F.2d 727, 731-32 (9th Cir. 1986) (proximity sufficient where less than two months

9    passed).

10          The record before the Court contains evidence that Brown was aware of Plaintiff's

11   Title VII complaints, since Plaintiff states that she specifically related her complaint of

12   discriminatory treatment in a meeting with Brown on July 3, 2012.   McNamee Decl.,

13   Ex. K, ECF No. 49, at ¶ 47.  Only a month passed between that meeting with Brown on

14   July 3, 2012, and Plaintiff's discharge on August 3, 2012.  The close temporal proximity

15   and the evidence that Brown was aware of the protected activity are sufficient

16   circumstantial evidence to show a causal link between the protected activity and the

17   adverse action.  Accordingly, Plaintiff sets forth sufficient evidence to establish a prima

18   facie case on this claim, and the burden shifts to the Defendants to articulate a

19   legitimate, nonretaliatory explanation for its decision.  Steiner, 25 F.3d at 1464-65.

20          Defendants, on the other hand, claim that Brown terminated Plaintiff's

21   employment because she determined that Plaintiff was "not the person that could lead

22   the athletic department consistent with Brown's vision for the school."  SUF ¶ 37.  They

23   claim that this constituted a legitimate ground for terminating Plaintiff.  Assuming

24   arguendo that Defendants' proffered reason is a sufficient legal explanation for Plaintiff's

25   discharge, the burden shifts to Plaintiff to show that the reason is merely pretextual.

26          To show pretext, Plaintiff must point to evidence that the Defendants'

27   nonretaliatory explanation for her discharge is mere pretext to conceal a retaliatory

28   motive.  Steiner, 25 F.3d at 1465.  Here, citing her qualifications, work performance, and

1   skills, Plaintiff contends that it would not have made business sense to discharge her

2   without a discriminatory motive.  ECF No. 48 at 15; DF Diocese ¶ 126.  She further

3   states Brown failed to inform her of any particular performance deficiencies before her

4   discharge (aside from the 2012 warning), allegedly in violation of the St. Francis

5   discipline policy.  DF Diocese ¶ 125.  In contrast, Defendant claims that Plaintiff failed to

6   mention discrimination or harassment in multiple written complaints, memos, and notes

7   that she wrote during the time period in question.  ECF No. 41-1 at 20-21.  However,

8   Defendants' argument overlooks documents written by Plaintiff where she specifically

9   states that she was being subjected to "harassment," "bullying," and "defamation," and

10  where she further claims that the St. Francis administration was not providing her

11  "sufficient support" in countering this negative treatment.  McNamee Sept. 17, 2010

12  Letter, Ex. 20, ECF No. 51, at 35-39; McNamee June 9, 2011 Letter, Ex. 31, ECF

13  No. 51, at 48-50.  In addition, while Defendants claim that Plaintiff never directly

14  complained to Brown about discriminatory treatment, and only referenced workplace

15  concerns about Pitton and school administrators, this is directly in contrast to Plaintiff's

16  assertion that she told Brown in July 2012 that she had experienced "discrimination and

17  retaliation" at St. Francis.  ECF No. 41-1 at 22; McNamee Decl., Ex. K, ECF No. 49, at ¶

18  47.  Based on this conflicting evidence, there is a genuine issue of material fact as to

19  whether Brown's proffered reason for discharging Plaintiff is merely pretextual.

20  Accordingly, Defendant's Motion for Summary Judgment for the Title VII retaliation claim

21  is DENIED.

22          **B.      Second Claim for Relief: Title VII - Gender Discrimination**

23          Similar to her retaliation claim, Plaintiff's gender discrimination claim under Title

24  VII requires her to first establish a prima facie case of discrimination.  McDonnell

25  Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  To establish a prima facie case, the

26  plaintiff must show that: (1) she belongs to a protected class; (2) she was qualified for

27  the position; (3) she was subject to an adverse employment action; and (4) similarly

28  situated individuals outside her protected class were treated more favorably.  Chuang v.

1  Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1123 (9th Cir. 2000) (citing McDonnell

2  Douglas, 411 U.S. at 802).  Once a plaintiff establishes such a prima facie case, "[t]he

3  burden then must shift to the employer to articulate some legitimate, nondiscriminatory

4  reason for the employee's rejection."  McDonnell Douglas, 411 U.S. at 802.  If the

5  employer does so, the plaintiff must show that the articulated reason is pretextual.

6  Chuang, 225 F.3d at 1124.  Pretext may be shown in one of two ways: "(1) indirectly, by

7  showing that the employer's proffered explanation is 'unworthy of credence' because it is

8  internally inconsistent or otherwise not believable, or (2) directly, by showing that

9  unlawful discrimination more likely motivated the employer."  Id. at 1127 (quoting Godwin

10  v. Hunt Wesson, Inc., 150 F.3d 1217, 1220-22 (9th Cir. 1998)).

11         Defendants do not argue that Plaintiff fails to make a prima facie case of gender

12  discrimination.  Rather, they claim that there is no evidence that Brown's stated reason

13  for discharging Plaintiff is pretextual.  Additionally, Defendants claim that there can be no

14  gender discrimination at St. Francis because it is an all-girls school with a majority of

15  female staff and a fairly-balanced division of female and male athletic department

16  personnel.  ECF No. 55 at 11.  The Court disagrees.  Contrary to Defendants'

17  assertions, Plaintiff's claim does not relate to the treatment of women as a whole at

18  St. Francis, but rather how she in particular was discriminated against as a female

19  athletic director.  As such, the gender composition of the school staff does not preclude

20  Plaintiff's discrimination claim.

21         In any event, Defendants contend that Brown terminated Plaintiff's employment

22  because Plaintiff did not have an "adequate vision for the future of the athletic

23  department" and also contends that Brown was under the impression that Plaintiff

24  planned  to voluntarily resign.  Brown Decl., ECF No. 40-5, at ¶¶ 4-5.  Plaintiff, on the

25  other hand, alleges that she presented Brown with ideas on how the athletic department

26  could grow in a positive direction, and claims she told Brown that she wanted to continue

27  in her role as athletic director.  McNamee Decl. at ¶¶ 47-48.  Plaintiff also avers that she

28  had an exemplary employment record (ECF No. 48 at 15; DF Diocese ¶ 126) and that

1    far from agreeing to resign, was instead "devastated" when she found out her job was

2    terminated.  McNamee Decl. at ¶ 52.  Based on this indirect evidence of pretext, a

3    reasonable jury could infer that Brown's proffered reason was merely a pretext for a

4    discriminatory motive.  See Munoz v. Mabus, 630 F.3d 856, 865 (9th Cir. 2010) (holding

5    that "specific and substantial" circumstantial evidence of a retaliatory or discriminatory

6    motive satisfies a plaintiff's burden of showing pretext).   Accordingly, Defendants'

7    Motion for Summary Judgment is DENIED for Plaintiff's gender discrimination claim.

8                    **C.      Third Claim for Relief: Defamation**

9          Plaintiff asserts a claim of defamation and alleges that the individual Defendants

10   Bishop, O'Neill, and Faires made written or oral defamatory statements on at least three

11   different occasions.  ECF No. 44 at 8-9.  To succeed in her defamation claim under

12   California law, Plaintiff must establish the "intentional publication of a statement of fact

13   that is false, unprivileged, and has a natural tendency to injure or which causes special

14   damage."  Scott v. Solano Cnty. Health and Soc. Servs. Dep't, 459 F. Supp. 2d 959, 973

15   (E.D. Cal. 2006) (quoting Smith v. Maldonado, 72 Cal. App. 4th 637, 645 (1999)).

16   Publication means "communication to a third person who understands the defamatory

17   meaning of the statement and its application to the person to whom reference is made."

18   Id.

19         Defendants make four arguments as to why Plaintiff's claim must fail, and further

20   contend that one allegedly defamatory statement was never published.  Additionally,

21   Defendants claim that Plaintiff cannot recover punitive damages as to her defamation

22   claim because there is not sufficient evidence that Defendants acted with malice.  For

23   the following reasons, the Court disagrees.

24                    **1.      A jury could find that Defendants' statements were not made in
                          the context of performance evaluations.**
25

26         First, Defendants claim the allegedly defamatory statements were made in the

27   context of performance evaluations, and therefore cannot form the basis of a defamation

28   claim under California case law.  ECF No. 40-1 at 9-11.  In support of this proposition,

1   Defendants rely heavily on <u>Jensen v. Hewlett-Packard Co.</u>, 14 Cal. App. 4th 958 (1993).

2   The <u>Jensen</u> court held that in the context of performance evaluations, defamation claims

3   are only actionable if the evaluations include false accusations of "criminal conduct, lack

4   of integrity, dishonesty, incompetence or reprehensible personal characteristics or

5   behavior."  <u>Id.</u> at 965.  Here, Plaintiff contends that the statements were not made as

6   part of performance evaluations but, rather, are comments between St. Francis staff and

7   the Diocese regarding Plaintiff's complaints of discrimination and retaliation.  ECF No. 44

8   at 13.  In <u>Jensen</u>, the court noted that "the primary recipient and beneficiary" of a

9   performance review "is the <u>employee</u>" herself, and that performance evaluations serve

10  as a "vehicle for informing the employee of what management expects."

11  14 Cal. App. 4th at 964 (emphasis added).  Here, unlike the facts in <u>Jensen</u>, it is

12  undisputed that Plaintiff's supervisors never presented her with the allegedly defamatory

13  documents (SUF Individuals at ¶¶ 14-31), which undercuts Defendants' argument that

14  the written and oral statements formed part of Plaintiff's performance evaluation.  As

15  such, Plaintiff's defamation claim is not proper for summary judgment on that basis.

16
17
        **2.**        **A jury could find that Defendants' statements are provably false.**

18        Next, Defendants argue that Defendants' allegedly defamatory remarks are

19  statements of opinion which cannot be "provably false."  To be defamatory, a statement

20  must convey a false factual implication that is "provably false."  <u>See</u> <u>Milkovich v. Lorain</u>

21  <u>Journal Co.</u> 497 U.S. 1, 20, (1990).  The "totality of the circumstances" test is applied in

22  determining whether a statement is a factual assertion, and the test takes into account

23  "the subject of the statements, the setting, and the format of the work."  <u>Rodriguez v.</u>

24  <u>Panayiotou</u>, 314 F.3d 979, 986 (9th Cir. 2002) (quoting <u>Underwager v. Channel 9</u>

25  <u>Australia</u>, 69 F.3d 361, 366 (9th Cir. 1995)).  Additionally, the "court must place itself in

26  the position of the . . . reader, and determine the sense of meaning of the statement

27  according to its natural and popular construction and the natural and probable effect [it

28  would have] upon the mind of the average reader."  <u>Id.</u> (quoting <u>Winter v. DC Comics</u>,

1   121 Cal. Rptr. 2d 431, 437 (2002)) (internal quotations omitted).

2          In the employment context, statements pertaining to an employee's incompetence

3   have been found to be "reasonably susceptible of a provably false meaning" when they

4   are "asserted as an 'actual' condition, a matter-of-fact."  Kahn v. Bower, 232 Cal. App. 3d

5   1599, 1609 (1991).  In contrast, mere "speculation or rumination" on the existence of a

6   fact or condition do not have the requisite factual content.  Id. (finding defendant's

7   statement that she "wonder[ed]" about plaintiff's hostility to children was mere opinion,

8   while direct statements about plaintiff's incompetence in her job were capable of being

9   "provably false").

10          Here, the statements at issue contend that Plaintiff was "divisive,"

11   "insubordinat[e]," "does not follow through," fails to be "professional" and "a team player,"

12   and shows an "unwillingness to be held accountable."   ECF No. 44 at 3-4.  These

13   statements go beyond mere "speculation or rumination" since they relate to behavior the

14   declarants contend to be true based on their direct experiences with Plaintiff.  Further,

15   the statements are allegations made to Plaintiff's superiors about her work performance

16   and relationships.  In that context, the listener would have expected the information to be

17   factual since such statements about Plaintiff's workplace behavior and capabilities could

18   affect her employer's hiring and firing decisions.  As in Kahn, the statements about

19   Plaintiff's unsatisfactory work performance and relationships are reasonably susceptible

20   of a factual interpretation, and whether those assertions are "true or false" is a triable

21   issue of fact.  232 Cal. App. 3d at 1609.

22          Moreover, the cases cited by Defendants are factually inapposite to the present

23   matter.  For example, to support their argument, Defendants cite Nygard, Inc. v. Timo

24   Uusi-Kertulla, 159 Cal. App. 4th 1027, 1052-1053 (2008).  ECF No. 40-1 at 13.  In

25   Nygard, the court held that defendant employee's statements that he was forced to

26   "work around the clock" and was treated like a "slave" were merely rhetorical hyperbole

27   that did not amount to factual assertions.  Id.  Here, Defendants' statements are readily

28   distinguishable from the exaggerated and hyperbolic assertions in Nygard.  As stated

1   above, Defendants' statements convey their observations of Plaintiff's work, and, unlike

2   Nygard, the statements do not include assertions that could not possibly be true.

3   Accordingly, the statements may be understood as assertions of fact and a reasonable

4   jury could determine them to be false.

5              **3.    A jury could find actual malice sufficient to overcome the
                       common interest privilege.**

6

7        Third, Defendants contend that the allegedly defamatory communications are

8   privileged under the "common interest privilege" pursuant to section 47(c) of the

9   California Civil Code and that Plaintiff cannot show actual malice to overcome that

10  privilege.  ECF No. 40-1 at 14-16.  Plaintiff does not dispute that the communications

11  meet the prima facie case for the common interest privilege, but she argues that the

12  statements are rendered unprivileged because they were made with actual malice.  ECF

13  No. 44 at 18.  The Court finds there are triable issues of fact regarding malice.

14       Once the defendant has demonstrated that the allegedly defamatory

15  communication was made upon a privileged occasion, then the burden shifts to the

16  plaintiff to prove that the defendant made the statement with malice.  Lundquist v.

17  Reusser, 7 Cal. 4th 1193, 1208 (1994).  Malice in defamation cases means actual or

18  express malice, including a state of mind arising from "hatred or ill will towards the

19  plaintiff, or by a showing that the defendant lacked reasonable grounds for belief in the

20  truth of the publication and therefore acted in reckless disregard of the plaintiff's rights."

21  Noel v. River Hills Wilsons, Inc., 113 Cal. App. 4th 1363, 1370 (2003) (quoting Sanborn

22  v. Chronicle Pub. Co., 18 Cal. 3d 406, 413 (1976)).  Mere negligence is not enough to

23  constitute malice.  Id. at 1371.  "It is only when the negligence amounts to a reckless or

24  wanton disregard for the truth, so as to reasonably imply a willful disregard for or

25  avoidance of accuracy, that malice is shown."   Id. (quoting Roemer v. Retail Credit Co.,

26  3 Cal. App. 3d 368, 371–372 (1970).

27       Here, there is sufficient evidence that Defendants spoke with actual malice when

28  they made the statements concerning Plaintiff's work performance and her relationships

1   with staff and parents.  Viewed in the light most favorable to Plaintiff, the evidence

2   suggests that Defendants made these statements because they wanted to see Plaintiff

3   disciplined or fired for engaging in  protected activity, or that they made the statements

4   at issue despite lacking reasonable grounds for believing they were true.  Plaintiff

5   supports this interpretation of the evidence by pointing out that she was never notified of

6   any the alleged performance and behavioral issues made in the communications.  ECF

7   No. 44 at 14.

8           In their Reply, Defendants do not dispute that they never informed Plaintiff of

9   these alleged performance deficiencies.  Instead, they interpret the evidence as showing

10   that they attempted to act reasonably and charitably towards Plaintiff because of the

11   prior positive employee reviews she had been given.  ECF No. 54 at 10.  Defendants go

12   on to argue that the allegedly defamatory statements were made merely to convey

13   information about Plaintiff's workplace conduct and performance.  Id.  at 11.  In making

14   that argument, however, Defendants sidestep the issue of why Plaintiff was not provided

15   with a copy of the written communications, or why she was never informed of her alleged

16   work deficiencies if Defendants felt that her work behavior needed to be corrected.

17   Without any constructive purpose behind the communications, a jury could determine

18   that the statements were made with hatred or ill will toward Plaintiff in response to her

19   allegations of discrimination and retaliation.  Given all of this evidence, the Court

20   concludes there is a question of fact with regard to whether Defendants acted with

21   malice.

22                   **4.     Workers' Compensation Act**

23           Defendants also maintain that Plaintiff's defamation claim is barred in any event

24   by workers compensation exclusivity.  ECF No. 40-1 at 16.  The Workers Compensation

25   Act ("WCA") provides that worker's compensation liability "in lieu of any other liability

26   whatsoever to any person . . . shall, without regard to negligence, exist against an

27   employer for any injury sustained by his or her employees arising out of and in the

28   course of the employment."  Cal. Lab. Code § 3600.  The WCA is generally the

1   "exclusive" remedy for claims against co-employees, and the "sole and exclusive

2   remedy" for claims against employers.  See Cal. Lab. Code §§ 3601-3602.

3   Citing Miklosy v. Regents of University of California, 44 Cal. 4th 876, 902 (2008),

4   Defendants contend that the WCA bars defamation claims arising out of and in the

5   course of employment.  The Court disagrees.  Miklosy held that the WCA was the

6   exclusive remedy for an intentional infliction of emotional distress claim based on

7   emotional injuries sustained during the course of employment; it does not address

8   whether the WCA precludes defamation claims.  Id. (concluding that employee's

9   emotional distress claim was preempted by the worker's compensation scheme).

10  Defendants also contend, however, that the individual Defendants are insulated from

11  Plaintiff's defamation claims based on the California Supreme Court's ruling in Cole v.

12  Fair Oaks Fire Protection Dist., 43 Cal. 3d 148, 160-61 (1987).  Like Miklosy, Cole is

13  similarly inapposite to the present action since it also dealt with a claim for intentional

14  infliction of emotional distress rather than defamation.  Id.

15  Contrary to Defendants' contention, the California Supreme Court's "opinions to

16  date and decisions of the Courts of Appeal all indicate that the Workers' Compensation

17  Act does not preclude a civil action for defamation against one's employer."  See

18  Operating Eng'rs Local 3 v. Johnson, 110 Cal. App. 4th 180, 186–87 (2003).  In Vacanti

19  v. State Comp. Ins. Fund, the California Supreme Court observed that "courts have

20  exempted defamation claims from exclusivity because an injury to reputation does not

21  depend on a personal injury."  24 Cal. 4th 800, 814 (2001).  Federal courts applying

22  California law have reached the same conclusion.  See Washington v. Cal. City

23  Correction Ctr., No. 10–CV–02031, 2011 WL 336461, at *6 (E.D. Cal. 2011) ("The WCA

24  does not bar Plaintiff's claim for defamation."); Johnson v. Wells Fargo & Co., Inc., No.

25  CV 14-06708, 2014 WL 6475128, at *11 (C.D. Cal. 2014). Accordingly, Plaintiff's

26  defamation claim is not barred by the WCA.

27  **5.      A jury could find the Faires Letter was published.**

28  Finally, Defendants argue that Plaintiff cannot show the "Incident Report" written

1   by Faires on September 20, 2011, was ever published.  ECF No. 40-1 at 14.

2   "Publication, which may be written or oral, is defined as a communication to some third

3   person who understands both the defamatory meaning of the statement and its

4   application to the person to whom reference is made."  Ringler Assoc., Inc. v. Md. Cas.

5   Co., 80 Cal. App. 4th 1165, 1179 (2000); see also Restatement (2d) Torts, § 577.  Here,

6   the letter in question was provided to Plaintiff during discovery, and she does not have

7   any direct evidence that Faires ever provided the document to Brown or another third

8   party.  However, there is enough evidence in the record from which a reasonable jury

9   could infer that Faires either provided the document to Brown or orally communicated

10  the information to her.  Brown stated in her deposition that she was "flooded with

11  information" and documents from people at the school after becoming President at St.

12  Francis.   Brown Dep., Ex. B., ECF No. 49, at 187:11-19.  Brown also states that Faires

13  provided her with input on Plaintiff's work during several conversations in the month prior

14  to Plaintiff's termination.  Id. at 182:16-184:4;186:20-22.  Faires herself states that she

15  was told by former President O'Neill to draft incident reports, like the September 20,

16  2011 report, to memorialize problematic situations.  Faires Dep., Exh. F, ECF No. 49, at

17  259:1-10.  Further, Faires acknowledges that she writes incident reports in order "to jog

18  [her] memory."  Id. at 311:21-312:2.  The deposition testimony of Faires and Brown is

19  enough evidence for a reasonable jury to infer that Faires conveyed the information in

20  the September 20, 2011 incident report to Brown, either verbally or in written form,

21  during one of their several conversations.  Accordingly, Defendants' motion for summary

22  judgment is DENIED as to the defamation claim.

23                      **6.    Punitive Damages for Defamation Claim**

24          Finally, Defendants move the Court for summary judgment on Plaintiff's claim for

25  punitive damages, arguing that Plaintiff cannot show by clear and convincing evidence

26  that Defendants acted with malice.  ECF No. 40-1 at 17.  Pursuant to section 3294 of the

27  California Civil Code, Plaintiff can recover punitive damages in the defamation claim only

28  if "it is proven by clear and convincing evidence that the defendant[s] ha[ve] been guilty

1   of oppression, fraud, or malice."  "Determinations related to assessment of punitive

2   damages have traditionally been left to the discretion of the jury."  Egan v. Mutual of

3   Omaha Ins. Co., 24 Cal. 3d 809, 821 (1979).  As discussed above, there is sufficient

4   evidence that the allegedly defamatory statements, particularly those made to Brown,

5   were not merely made out of carelessness or frustration, but were rather deliberate acts

6   to have Plaintiff fired or disciplined.  Further, a jury might find that the evidence proffered

7   by Plaintiff constitutes clear and convincing evidence of such malice to support an award

8   of punitive damages.  Thus, Defendants' motion for summary judgment on Plaintiff's

9   claim for punitive damages is DENIED.

10

11                                          **CONCLUSION**

12

13          As set forth above, Defendants' Motions for Summary Judgment (ECF No. 40,

14   ECF. No. 41) are DENIED.

15          IT IS SO ORDERED.

16   Dated:  March 27, 2015

17

18

19   _____
     MORRISON C. ENGLAND, JR, CHIEF JUDGE

20   UNITED STATES DISTRICT COURT

21

22

23

24

25

26

27

28